**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 06-22253-CIV-ALTONAGA/Turnoff**

**MOTHER DOE I** and **FATHER DOE I**,
individually, and as parents and guardians
for minor **R.M.**, *et al.*,

       Plaintiffs,

vs.

**SHEIKH MOHAMMED BIN RASHID**
**AL MAKTOUM**, *et al.*,

       Defendants.

_____/

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**[1]

**THIS CAUSE** came before the Court for a hearing on July 16, 2007, on Defendants, Sheikh

Mohammed Bin Rashid Al Maktoum ("Sheikh Mohammed") and Sheikh Hamdan Bin Rashid Al

Maktoum's ("Sheikh Hamdan['s]") (collectively, "Defendants[']") Motion to Dismiss the Complaint

[D.E. 35], filed on December 22, 2006. In their Motion to Dismiss, Defendants argue that Plaintiffs'

Complaint should be dismissed because: (1) the Court should abstain from deciding the case based

on the doctrine of international comity; (2) the case presents nonjusticiable political questions; (3) the

doctrine of *forum non conveniens* mandates dismissal; (4) Defendants enjoy immunity from suit under

the head of state immunity doctrine; (5) the Court lacks personal jurisdiction over the Defendants;

---

[1] On July 12, 2007, the United States of America filed a Notice of Potential Participation [D.E. 94], in which it asserts that it is considering whether to participate in this suit pursuant to 28 U.S.C. § 517. The United States requests that the Court defer any resolution of Defendants' Motion to Dismiss until after September 17, 2007, the date by which the United States intends to file any substantive memorandum regarding the issues in this case. Thereafter, on July 26, 2007, the United States filed a Notice of Intent to File a Statement of Interest [D.E. 96], in which it indicates that it intends to file a Suggestion of Head of State Immunity with respect to Defendant, Sheikh Mohammed Bin Rashid Al Maktoum, the Prime Minister of the United Arab Emirates. In this more recent filing, the United States again requests that the Court defer ruling on Defendants' Motion to Dismiss until the United States has had an opportunity to set forth its position on the Motion. The Court is cognizant of the United States' position, but finds that its granting of Defendants' Motion at this time for the reasons explained in this Order does not offend that position.

and (6) Plaintiffs have improperly proceeded on an anonymous basis.  In addition to these arguments, Sheikh Mohammed asserts that he enjoys diplomatic immunity from suit and Sheikh Hamdan asserts that he was improperly served with the Complaint and summons.  The Court has carefully considered the parties' arguments and written submissions, the *amicus curiae* brief of the Washington Legal Foundation ("WLF") [D.E. 56-3], and applicable law.

## I.  BACKGROUND

In September of 2006, Plaintiffs filed their Complaint [D.E. 1] alleging that Sheikh Mohammed, the Vice President and Prime Minister of the United Arab Emirates ("UAE"), and Sheikh Hamdan, the Finance Minister of the UAE, participated, in their personal capacities, in the kidnaping, trafficking, and enslavement of young boys from South Asia and Africa, some as young as two years old, who were transported to the UAE and other Persian Gulf countries to serve as jockeys in camel races.[2]  Plaintiffs, former child jockeys, both identified and unidentified, and their parents, both in their individual capacities and as personal representatives of the children, allege that during the course of their enslavement as jockeys, the children were at times, *inter alia*, starved, deprived of sleep, injected with hormones to keep them from growing, and sexually abused.  (*See Compl.* [D.E. 1] at ¶¶ 72, 81).

Plaintiffs bring their lawsuit pursuant to the Alien Tort Statute, 28 U.S.C. § 1350, which provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  Specifically, Plaintiffs assert that Defendants engaged in, conspired to engage in, and/or aided and abetted: (1)

---

[2] Plaintiffs also assert claims against a number of unnamed defendants.

slavery or the slave trade in violation of the law of nations; and (2) forced child labor in violation of

the law of nations.  Plaintiffs also assert battery, assault, intentional and/or negligent infliction of

emotional distress, wrongful death, and survival claims against Defendants, seeking compensatory

and punitive damages in an amount to be determined.

The case raises a number of relatively novel issues of jurisdiction and international law, which

the parties have extensively and competently briefed.  Because the Court concludes that it lacks

personal jurisdiction over the identified Defendants, it does not reach or address the merits of the

other arguments raised.

## II.  ANALYSIS

The Eleventh Circuit has held that in deciding Rule 12(b) motions to dismiss, district courts

should, as an initial matter, address any personal jurisdiction arguments raised by defendants.  *See*

*Madara v. Hall*, 916 F.2d 1510, 1513-14 (11th Cir. 1990).  Accordingly, the undersigned first

addresses Defendants' argument that the Court lacks personal jurisdiction over them.  Defendants

assert that the Court lacks personal jurisdiction under the Florida long-arm statute and the Due

Process Clause of the Fourteenth Amendment to the United States Constitution (the "Due Process

Clause") because Defendants have had insufficient (or non-existent) contacts with the State of

Florida.  They assert, therefore, that the undersigned should dismiss the case in its entirety.

In response, Plaintiffs assert that the Court may exercise personal jurisdiction over Defendants

based on what Plaintiffs maintain are Defendants' extensive contacts with the State of Florida.  In the

alternative, Plaintiffs assert that, should the Court find that Defendants' contacts do not satisfy the

Florida long-arm statute, the Court may exercise personal jurisdiction pursuant to Federal Rule of

Civil Procedure 4(k)(2).  The undersigned addresses these potential bases for jurisdiction in turn.

A.     **Exercise of Personal Jurisdiction Under the Florida Long-Arm Statute**

1.     **Legal Standard**

Generally, a federal court may properly exercise personal jurisdiction over a non-resident defendant only if two requirements are satisfied: (1) the state long-arm statute, and (2) the Due Process Clause.  *See Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1214 (11th Cir. 1999); *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626 (11th Cir. 1996).[3]  Thus, if the applicable state statute governing personal jurisdiction is satisfied, the Court must then determine whether sufficient "minimum contacts" exist to satisfy the due process requirements of the Fourteenth Amendment, which include "traditional notions of fair play and substantial justice."  *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000) (per curiam); *see also Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

In this case, the personal jurisdiction analysis is governed by Florida law.  *See Sculptchair*, 94 F.3d at 631.  Under Florida law, "[a] plaintiff seeking to obtain jurisdiction over a nonresident defendant initially need only allege jurisdiction."  *Posner*, 178 F.3d at 1214 (citing *Electro Eng'g Prods. Co. v. Lewis*, 352 So. 2d 862, 864 (Fla. 1977)).  "Plaintiff's burden in alleging personal jurisdiction is to plead sufficient material facts to establish the basis for exercise of such jurisdiction."  *Future Tech.*, 218 F.3d at 1249; *see also Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 502 (Fla. 1989).  If a plaintiff pleads sufficient material facts to support the exercise of personal jurisdiction, the burden shifts to the defendant to challenge the plaintiff's allegations by affidavits or other competent evidence.  *Future Tech.*, 218 F.3d at 1249.  If the non-resident defendant raises a

---

[3] An exception applies where the requirements of Rule 4(k)(2) are satisfied.  That provision is addressed separately in this Order.

meritorious defense to the court's exercise of personal jurisdiction, the burden shifts back to the plaintiff to establish through competent evidence that the court's exercise of jurisdiction is appropriate.  *See Musiker v. Projectavision, Inc.*, 960 F. Supp. 292, 294-95 (S.D. Fla. 1997); *Kim v. Keenan*, 71 F. Supp. 2d 1228, 1231 (M.D. Fla. 1999) ("If defendants sufficiently challenge plaintiff's assertions, then plaintiff must affirmatively support his or her jurisdictional allegations, and may not merely rely upon the factual allegations set forth in the complaint.").

The Florida long-arm statute provides for the exercise of personal jurisdiction over non-resident persons who are "engaged in substantial and not isolated activity within this state, . . . whether or not the [plaintiff's] claim arises from that activity." Fla. Stat. § 48.193(2).  In order to exercise personal jurisdiction under this provision, the Court must find that Defendants "maintained 'continuous and systematic . . . contacts' with the forum, so that [they] can properly be considered 'present' in the forum."  *Am. Overseas Marine Corp. v. Patterson*, 632 So. 2d 1124, 1127-28 (Fla. 1st DCA 1994) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 411-12 (1984)).

## 2.    Parties' Respective Positions

### a.    Plaintiffs' Allegations and Evidence Regarding Defendants' Contacts in Florida[4]

In their Complaint, Plaintiffs allege that the Court has personal jurisdiction over Defendants pursuant to Fla. Stat. § 48.193(2), and that Defendants "have purposefully directed their activities within the United States making them subject to the jurisdiction of the Courts and the laws of the

---

[4] In the interest of efficiency, the undersigned summarizes in this subsection both the jurisdictional allegations contained in Plaintiffs' Complaint and the evidence regarding Defendants' alleged contacts with Florida that Plaintiffs have submitted in support of their opposition to Defendants' Motion.

United States." (*See Compl.* at ¶¶ 1-2). Plaintiffs allege that those activities include, but are not limited to Defendants:

a.      Personally operating, both as alter egos and as agents of, businesses with billions of dollars of U.S. assets and millions of dollars in Florida assets;

b.      Personally owning and operating, both as alter egos and as agents of, several U.S. corporations, including ones registered to do business in Florida;

c.      Personally effectuating large purchases and sales of billions of dollars of U.S. assets, including millions of dollars of assets in Florida;

d.      Personally visiting the United States, including Florida, in a non-official capacity both for pleasure and in operating their extensive businesses here;

e.      Owning multiple residences and hundreds of millions of dollars in investment real estate in the United States, including in Florida; and

f.      Employing hundreds of people in the United States, and personally managing and directing those employees, including agents and employees in Florida.

(*Id.* at ¶ 3).

Plaintiffs further allege that Defendants' contacts with the State of Florida include: (1) owning "businesses and residences throughout the United States," (*id.* at ¶¶ 24-25); (2) "maintain[ing] hundreds of horses at farms in Ocala, Florida," (*id.* at ¶ 27); and (3) "regularly purchas[ing] or bid[ding] on horses in Florida personally and through agents," including "attend[ing] and regularly purchas[ing] horses at the Ocala Breeders' Sales Company's Thoroughbred sales in Ocala, Florida," which purchases include Sheikh Mohammed's February 28, 2006 bid of $15.5 million for a colt at an auction at Calder Racetrack in Miami, Florida, (*id.* at ¶ 30).

In addition, Plaintiffs allege that certain corporate contacts with the State of Florida should be attributed to Defendants. First, Plaintiffs allege that Godolphin Racing, Inc. ("Godolphin Racing"), the U.S. subsidiary of a Dubai-based company named Godolphin Racing, is the "alter ego"

6

of Defendants and that Defendants "perform actions on behalf of Godolphin Racing and its various entities in the United States." (*Id.* at ¶ 31). In a declaration from their counsel, John M. Eubanks, Esq. ("Eubanks"), submitted in aid of their Response to Defendants' Motion, Plaintiffs additionally assert that Godolphin Racing has been qualified to do business in Florida since 1994, as evidenced by photocopies of the annual reports it filed with the Florida Secretary of State for the years 1996 through 2005. (*See Eubanks Decl.* [D.E. 50] at ¶ 6 and Ex. E).

Second, Plaintiffs allege that Darley Farms of Kentucky ("Darley Farms") is a corporation that is wholly-owned by Sheikh Mohammed and acts as his alter ego. (*See Compl.* at ¶ 32). Darley Farms owns the 2006 Preakness Stakes winner, Bernardini, a horse that was stabled in Florida in the winter leading up to the 2006 racing season. (*See id.* at ¶¶ 27, 32). In addition, Eubanks asserts that an entity named Darley Stud Management, Inc. was qualified to do business in Florida from 1996 through 2001, and an entity named Darley Stud Management LLC has been qualified to do business in Florida from 2002 through 2006, as evidenced by copies of annual reports filed by those entities with the Florida Secretary of State. (*See Eubanks Decl.* at ¶ 8 & Ex. G).

Third, Plaintiffs allege that Sheikh Hamdan performs actions on behalf of Shadwell Farms, LLC ("Shadwell Farms"), a limited liability corporation incorporated in Kentucky in 1998. (*See Compl.* at ¶ 35). Shadwell Farms owns property in Kentucky and, Plaintiffs allege, was certified in 1996 to do business in Florida. (*See id.* at ¶¶ 35-36). Eubanks asserts in his declaration that an entity named Shadwell Farm, Inc. was qualified to do business in Florida from 1996 through 2003, and an entity named Shadwell Farm, LLC was qualified to do business in Florida from 2004 through 2005, as evidenced by copies of annual reports those entities filed with the Florida Secretary of State. (*See Eubanks Decl.* at ¶ 16 & Ex. O).

Fourth, Plaintiffs allege that Defendants are beneficial owners of the Dubai Holdings Company and its subsidiaries, one of which, Dubai Investment Group ("DIG"), through another subsidiary, Longwing Real Estate Ventures, owns the Adam's Mark Hotel in Jacksonville, Florida, among other properties throughout the United States.  (*See Compl.* at ¶ 38).

Finally, Plaintiffs allege that Dubai Ports World is Defendants' wholly-owned alter ego corporation, which Defendants both operate and act as agents for.  (*See id.* at ¶ 41).  Plaintiffs allege that Dubai Ports World, which is "owned and directed entirely by either [Sheikh Mohammed] or the Maktoums collectively[,]" entered into a 2006 agreement to purchase a number of United States port operations, including the Port of Miami.  (*Id.*).

### b.   *Defendants' Factual Assertions*

Defendants assert that Plaintiffs have failed to show that Defendants have *any* personal contacts with the State of Florida.  In support of this argument, Defendants offer two sworn declarations, one of which addresses Plaintiffs' allegations regarding Sheikh Mohammed and one of which addresses the allegations regarding Sheikh Hamdan.

In the first declaration, Mohammed Al Shaibani ("Al Shaibani"), who is President of The Dubai Office, which manages the personal financial affairs of the Al Maktoum family, and who manages the personal investments of Sheikh Mohammed, asserts that the jurisdictional allegations contained in Plaintiffs' Complaint with respect to Sheikh Mohammed are incorrect.  (*See Al Shaibani Decl.* [D.E. 41-2] at ¶¶ 1, 4).  Specifically, Al Shaibani asserts that Sheikh Mohammed: (1) neither owns nor leases any real or personal property located in Florida in his individual capacity, including any horses, all of which were purchased by or are owned by corporate entities, (*see id.* at ¶¶ 5a, 6); (2) does not have any personal or investment accounts of any type in Florida, (*see id.* at ¶ 5b); (3)

does not conduct business in Florida in his individual capacity, (*see id.* at ¶ 5c); (4) has not bought or sold any assets in Florida in his individual capacity, (*see id.* at ¶ 5d); (5) does not employ anyone in Florida, (*see id.* at ¶ 5e); (6) does not file tax returns in Florida, (*see id.* at ¶ 5f); and (6) is not a direct shareholder or owner of any business or corporation that is registered in, markets to, or conducts business transactions in Florida, (*see id.* at ¶ 5g).

With respect to Plaintiffs' allegations regarding Godolphin Racing, Al Shaibani asserts that the corporation is an independent corporation incorporated in Delaware with its principal place of business in Kentucky, and while it is held beneficially for Sheikh Mohammed, it has its own assets, management, and board of directors. (*See id.* at ¶ 7). Al Shaibani asserts that Sheikh Mohammed has no role in the day-to-day management of Godolphin Racing. (*See id.*). Finally, Al Shaibani asserts that, while Godolphin Racing does at times stable horses in Florida, it does not own any assets or properties located in Florida. (*See id.*).

With respect to the Adam's Mark Hotel in Jacksonville, Florida, Al Shaibani asserts that the hotel is owned through a joint venture between Longwing Real Estate Ventures, LLC ("Longwing") and Oxford Lodging. (*See id.* at ¶ 8). Longwing, a Delaware limited liability company, is wholly owned by Longwing Real Estate Ventures Inc., which operates out of New York as a subsidiary of DIG, a Dubai company that invests in real estate in the United States. (*See id.*). According to Al Shaibani, Sheikh Mohammed has no role in the day-to-day management of Longwing, which has its own assets, management, and board of directors. (*See id.*). Finally, Al Shaibani asserts that Longwing is simply a passive investor in the Adam's Mark Hotel, which is operated by Oxford Lodging, a company with which Defendants are entirely unrelated. (*See id.*).

With respect to Dubai Ports World, Al Shaibani asserts that the company is owned by Dubai

Ports Authority, a public corporation in the Emirate of Dubai, UAE, which is, in turn, controlled by Dubai Ports and Customs Free Zone Corporation, another public corporation in the Emirate of Dubai. (*See id.* at ¶ 9). According to Al Shaibani, Sheikh Mohammed has no role in the day-to-day management of Dubai Ports World. (*See id.*).

In the second declaration submitted by Defendants, Mirza Al Sayegh, who has been an advisor to Sheikh Hamdan for over 20 years and who is President of Shadwell Farms, asserts that the jurisdictional allegations contained in Plaintiffs' Complaint with respect to Sheikh Hamdan are incorrect. (*See Al Sayegh Decl.* [D.E. 42-2] at ¶¶ 1, 4). Specifically, Al Sayegh asserts that Sheikh Hamdan: (1) neither owns nor leases any real or personal property located in Florida in his individual capacity, including any horses, all of which were purchased by or are owned by corporate entities, (*see id.* at ¶¶ 5a, 6); (2) does not have any personal or investment accounts of any type in Florida, (*see id.* at ¶ 5b); (3) does not conduct business in Florida in his individual capacity, (*see id.* at ¶ 5c); (4) has not bought or sold any assets in Florida in his individual capacity, (*see id.* at ¶ 5d); (5) does not employ anyone in Florida, (*see id.* at ¶ 5e); (6) does not file tax returns in Florida, (*see id.* at ¶ 5f); (6) is not a direct shareholder or owner of any business or corporation that is registered in, markets to, or conducts business transactions in Florida, (*see id.* at ¶ 5g); and (7) has never visited Florida, (*see id.* at ¶ 5h).

With respect to Plaintiffs' allegations regarding Shadwell Farms, Al Sayegh asserts that the corporation is an independent corporation held beneficially for Sheikh Hamdan, with its own assets, management, and board of directors. (*See id.* at ¶ 7). Al Sayegh asserts that Sheikh Hamdan has no role in the day-to-day management of Shadwell Farms. (*See id.*). Finally, Al Sayegh asserts that,

while Shadwell Farms does at times send horses to Florida for training, it does not own any assets or properties located in Florida.  (*See id.*).

Al Sayegh asserts that Sheikh Hamdan has no involvement whatsoever with DIG, Longwing, Godolphin Racing, or Dubai Ports World.  (*See id.* at ¶¶ 8-11).

Defendants contend that these declarations conclusively illustrate that they had no personal contacts with the State of Florida, that acts of the corporations named in Plaintiffs' Complaint cannot be attributed to Defendants, and that, even if the corporate acts could be attributed to Defendants, the corporate contacts with the State of Florida would not be extensive enough to permit the exercise of general personal jurisdiction under Fla. Stat. § 48.193(2).  Defendants also assert that even if the long-arm statute is satisfied, the Due Process Clause prohibits the Court's exercise of personal jurisdiction over Defendants.

> c. ***Plaintiffs' Position Regarding Attribution of Corporate Acts to Defendants***

With respect to Sheikh Mohammed, Plaintiffs argue in their Response Brief that Godolphin Racing LLC and Darley Stables LLC[5] are "synonymous with Defendant Sheikh Mohammed."  (*See Resp. Br.* [D.E. 48] at 42).  In support of this assertion, Plaintiffs rely upon the Eubanks declaration. With respect to Godolphin Racing, Eubanks asserts that the Godolphin Racing website contains Sheikh Mohammed's image and a quote that has been attributed to him.  (*See Eubanks Decl.* at ¶ 3). Eubanks also asserts that Sheikh Mohammed's personal website touts Sheikh Mohammed's love for horses and his establishment of Godolphin Racing in 1994.  (*See id.* at ¶ 4).  Eubanks also points to

---

[5] The entity "Darley Stables LLC" is mentioned neither in Plaintiffs' Complaint nor in the Eubanks declaration.  Those documents mention only Darley Farms of Kentucky, (*see Compl.* at ¶ 32), and Darley Stud Management, Inc. and Darley Stud Management LLC, (*see Eubanks Decl.* at ¶ 8).  Plaintiffs fail to explain how Darley Stables LLC, if that entity exists, is related to the other Darley entities or to Sheikh Mohammed.

an *International Herald Tribune* article that refers to Godolphin Racing as "Sheikh Mohammed['s] Godolphin stable." (*Id.* at ¶ 5).

With respect to Darley Farms,[6] Eubanks identifies a January 23, 2007 *USA Today* article that refers to Preakness Stakes winner Bernardini as being "owned by Sheikh Mohammed's Darley Stable[,]" (*id.* at ¶ 7), and a November 15, 2006 article published at http://www.ntra.com that refers to a horse being "purchased privately by Sheikh Mohammed's Darley Stable and transferred to trainer Eoin Harty's stable at Palm Meadows, Fla.[,]" (*id.* at ¶ 13). Eubanks also asserts that in March 2007, a John Ferguson ("Ferguson"), the bloodstock manager of Darley Stable, "who has been described as 'represent[ing] . . . Sheikh Mohammed al-Maktoum of Darley,' purchased seven horses at Miami's Calder Race Course on behalf of Sheikh Mohammed at a cost of $6.42 million." (*Resp. Br.* at 43; *Eubanks Decl.* at ¶¶ 2, 9). At the same sale held in the year 2005, Eubanks asserts, Ferguson called Sheikh Mohammed while bidding on horses. (*See Eubanks Decl.* at ¶ 10). Eubanks also identifies a February 14, 2007 article published at http://www.gainesway.com that states that "Sheikh Mohammed bin Rashid al Maktoum's Darley Stable bought a Smoke Glacken colt for $550,000 . . . ." (*Id.* at ¶ 11). Eubanks also attaches to his declaration a spreadsheet showing that Darley Stable and Ferguson purchased 43 horses for a total price of $37.67 million between 2003 and 2007. (*See id.* at ¶ 12 & Ex. K). Finally, Eubanks asserts that Ferguson has stated that Sheikh Mohammed "ha[s] horses at Robert Scanlon's training center" in Williston, Florida. (*Id.* at ¶ 10). With respect to Sheikh Hamdan, Plaintiffs argue that Shadwell Farms is "synonymous with" Sheikh Hamdan. (*Resp. Br.* at 44). In support of this argument, Plaintiffs again point to the *USA Today* article mentioned

---

[6] It is unclear from his declaration whether Eubanks intends to refer to Darley Farms of Kentucky, Darley Stud Management, Inc., Darley Stud Management LLC, or some other corporate entity.

above, which also refers to horse Invasor as being "owned by Sheikh Hamdan's Shadwell Farm." (*Eubanks Decl.* at ¶ 7). Plaintiffs also assert that "it has been widely reported that 'Sheikh Hamdan . . . competes at Shadwell Stable.'" (*Resp. Br.* at 45; *Eubanks Decl.* at ¶¶ 14-15 & Exs. M, N). Eubanks also cites to Sheikh Hamdan's website, which indicates that "Shadwell's global success is largely due to Sheikh Hamdan's great leadership and hands-on management." (*Eubanks Decl.* at ¶ 15).

Finally, Eubanks identifies three articles that were published on the Shadwell Farms website. (*See id.* at ¶¶ 17-19). The first article states that Shadwell Farms horse Jazil, which won the 2006 Belmont Stakes, raced at Gulfstream Park in Florida on February 8, 2007. (*See id.* at ¶ 17). The second article states that Shadwell Farms horse Invasor, which won the 2006 Breeders' Cup Classic, was to be housed in Palm Meadows, Florida. (*See id.* at ¶ 18). The third article states that Invasor raced at Gulfstream Park in Florida in 2007. (*See id.* at ¶ 19).

### 3.    Legal Analysis

The parties appear to agree that the Court's exercise of personal jurisdiction may not be premised upon Defendants' *in-person* contacts with the State of Florida, as Plaintiffs make no specific allegations regarding Sheikh Mohammed's travels to Florida and do not dispute Defendants' contention that Sheikh Hamdan has never even visited Florida. Plaintiffs also do not sufficiently demonstrate that any Defendants made any contacts with the State of Florida in their *individual capacities*, instead choosing to premise jurisdiction upon Defendants' involvement with and operation of various corporations.[7]   The only issue to be resolved, therefore, is whether the activities and

---

[7] Although Plaintiffs allege generally in their Complaint that Defendants, *inter alia*, "[p]ersonally effect[ed] large purchases and sales of . . . assets, including millions of dollars of assets in Florida," and "[p]ersonally own[] multiple residences . . . in the U.S., including in Florida," (*see Compl.* at ¶ 3), these bare allegations have been

contacts of Defendants' companies, Godolphin Racing, Darley Farms, Shadwell Farms, Longwing, and/or Dubai Ports World, some of which are registered to do business in or own property in Florida, may be attributed to Defendants for purposes of the Court's jurisdictional analysis.

Florida law is clear that, generally, "the actions of a corporation cannot be imputed to its shareholders for purposes of establishing long arm personal jurisdiction over the shareholder." *Suroor v. First Inv. Corp.*, 700 So. 2d 139, 141 (Fla. 5th DCA 1997). In *Suroor*, the court found that imputation of corporate acts to an individual defendant shareholder was inappropriate despite the plaintiff's explicit allegation that the defendant was the "beneficial owner" of the corporation. *See id.* This rule arises from the "basic tenet of American corporate law . . . that the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003).

Despite this general rule, "[a] nonresident shareholder of a corporation doing business in Florida may be subject to long-arm jurisdiction under an alter ego theory . . . ." *Aldea Commc'ns, Inc. v. Gardner*, 725 So. 2d 456, 457 (Fla. 2d DCA 1999). In order to properly allege the "alter ego" theory, a plaintiff must allege "both that the resident corporation was a mere instrumentality of its shareholders, and that the corporation was used for improper conduct." *Bellairs v. Mohrmann*, 716 So. 2d 320, 323 (Fla. 2d DCA 1998).

Plaintiffs argue that the corporate acts detailed in their Complaint may be attributed to Defendants because the corporations are "held beneficially" for Defendants. Despite the apparent "alter ego" language contained in their Complaint, Plaintiffs explicitly disclaim reliance on an alter

---

sufficiently overcome by the sworn declarations submitted by Defendants, in which individuals with personal knowledge assert that these allegations are untrue. Because Plaintiffs have failed to submit competent evidence to contradict the defense declarations, the undersigned focuses on Plaintiffs' allegations and arguments regarding Defendants' *corporate* contacts with the State of Florida.

ego theory and contend that they are *not* attempting to "pierce the corporate veil." (*See Resp. Br.* at 41). Instead, Plaintiffs assert that the fact that the corporations at issue are "held beneficially" for Defendants is sufficient to allow attribution of the corporate acts to Defendants as individuals. In support of this argument, Plaintiffs cite to a number of Commodity Futures Trading Commission cases brought pursuant to the Commodity Exchange Act, in which accounts or assets "held for the benefit of" an enjoined party were considered to be the enjoined party's property. (*See id.* at 40 (citing, *e.g.*, *Commodity Futures Trading Comm'n v. Valko*, 2006 WL 2620197, at *2 (S.D. Fla. Jan. 4, 2006))). Plaintiffs also cite to Federal Trade Commission cases in which real or personal property "held for the benefit of" a defendant was held to be included in the definition of the word "assets." (*See id.* (citing, *e.g.*, *Federal Trade Comm'n v. Bryant*, 2004 WL 2504357, at *2 (M.D. Fla. Oct. 4, 2004))). Plaintiffs also point out that pursuant to Florida law, funds placed in escrow are "held for the benefit of third persons[,]" but are considered assets of those persons. (*See id.*).

The essence of Plaintiffs' argument is that

corporations "beneficially held" for, and belonging to, the Defendants are assets of the Defendants for purposes of assessing the extent of Defendants' contacts here. . . . Defendants have a unity of interest with their "beneficially held" corporate entities that go directly to the substantial and not isolated contacts analysis sufficient to satisfy the Florida long-arm statute. Simply stated, . . . the Defendants do business in the State of Florida. Therefore, the assets of these corporate entities, including race horses, constitute assets of the individual Defendants as well.

(*Id.* at 41).

Plaintiffs' insistence that acts of corporate entities should be attributed to Defendants as individuals, despite their admission that they are not attempting to satisfy the "alter ego" theory,[8] is

_____

[8] As noted, Plaintiffs have explicitly stated, both in their briefs and at oral argument, that they are not proceeding under an alter ego theory. The undersigned also observes that the allegations of Plaintiffs' Complaint are plainly insufficient to satisfy the alter ego test. *See Bellairs*, 716 So. 2d at 323 (noting that in order to satisfy alter ego

contrary to well-settled principles of corporate law, and Plaintiffs have cited no authority to support their position.  Under the facts as alleged, and in the absence of an allegation or showing that the corporate veil should be pierced because Defendants failed to properly observe the corporate form, none of the corporate acts detailed in Plaintiffs' Complaint or in the Eubanks declaration may be imputed to Defendants as individuals.

While not necessary, the undersigned finds it useful to set forth some specific examples of the insufficiency of Plaintiffs' allegations.  First, Plaintiffs appear to argue that because a picture of and quotation by Sheikh Mohammed is featured on the Godolphin Racing website, that corporation should be considered an asset of Sheikh Mohammed's.  (*See id.* at 42).  If courts were to attribute corporate acts to every individual who is involved in establishing or is intimately involved with a corporation, or whose picture is featured on a corporation's website, the corporate form would be rendered completely meaningless.

Second, Plaintiffs rely upon news articles in which unidentified individuals, who may have no personal knowledge whatsoever regarding the Defendants or their assets, refer to certain corporations as, for example, "Sheikh Mohammed['s] . . . stable[,]" (*Eubanks Decl.* at ¶ 5), or "Sheikh Hamdan's Shadwell Farm[,]" (*id.* at ¶ 7).  These types of statements have no bearing whatsoever upon the question of whether the acts of corporations may be attributed to individuals for purposes of the Court's analysis of personal jurisdiction.

The fact that Defendants may have involvement, even extensive involvement, with corporations that do business in Florida is not sufficient, in and of itself, to establish that Defendants

---

theory, plaintiff must plead "both that the resident corporation was a mere instrumentality of its shareholders, and that the corporation was used for improper conduct").

themselves are subject to the personal jurisdiction of a Florida court.  *See Newberry v. Rife*, 675 So. 2d 684, 685 (Fla. 2d DCA 1996) ("The mere fact that one holds shares in or is a director of a corporation is not the functional equivalent of doing business in the state."); *Nichols v. Paulucci*, 652 So. 2d 389, 392 n.5 (Fla. 5th DCA 1995) ("By itself, ownership of property is insufficient to subject a nonresident defendant to the jurisdiction of the courts of this state, unless the cause of action arose out of such ownership.").  The undersigned therefore concludes that there is no basis upon which to exercise general personal jurisdiction over Defendants under Fla. Stat. § 48.193(2).

### B.    Exercise of Personal Jurisdiction Under Federal Rule of Civil Procedure 4(k)(2)

Having determined that the Florida long-arm statute does not allow the Court to exercise personal jurisdiction over Defendants, the undersigned turns to an analysis of whether Federal Rule of Civil Procedure 4(k)(2), the "federal long-arm statute," *see Saudi v. Northrup Grumman Corp.*, 427 F.3d 271, 275 (4th Cir. 2005), provides for the exercise of such jurisdiction.  Rule 4(k)(2) provides:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Because Plaintiffs base their claims, in part, upon federal law (the Alien Tort Statute), they may attempt to premise jurisdiction upon Rule 4(k)(2).  Even assuming that Plaintiffs properly served both Defendants (which both Defendants challenge), in order to establish the propriety of the exercise of jurisdiction under the Rule, Plaintiffs must establish that Defendants are not subject to personal jurisdiction in any state.  Such a conclusion is inconsistent with the allegations of Plaintiffs' Complaint.

In their Complaint, Plaintiffs allege that both Defendants: (1) "personally attend auctions and personally bid on horses in the United States," particularly at the Keeneland Thoroughbred sales in Lexington, Kentucky, (*Compl.* at ¶¶ 28-29); (2) "annually spend some part of the year in Kentucky where they have residences, survey their land holdings and conduct extensive business," (*id.* at ¶ 33); and (3) when in Kentucky, "often reside at Gainsborough Farm, where a staff of eight attends to them," (*id.*).  These allegations, as distinguished from Plaintiffs' allegations with respect to Florida, establish that Defendants have had personal contacts with the State of Kentucky.  It is unclear from the facts alleged here whether Defendants have engaged in those contacts solely in their capacity as agents of the above-mentioned corporations or whether some of the contacts have been made in Defendants' individual capacities.

Nevertheless, it appears that such alleged extensive contacts, including residing in Kentucky for some period of time, may allow a Kentucky court to exercise personal jurisdiction over Defendants.  In addition, there is no evidence before the Court regarding Defendants' contacts with states other than Florida and Kentucky.  The undersigned therefore cannot find, based on the record before her, that Defendants are "not subject to the jurisdiction of the courts of general jurisdiction of any state," and consequently the exercise of jurisdiction under Rule 4(k)(2) is not appropriate.

At oral argument, Plaintiffs asserted that should the undersigned find personal jurisdiction lacking in Florida, she should transfer the case to a district court in Kentucky.  The issue of the propriety of a Kentucky court's exercise of personal jurisdiction over Defendants has not been fully briefed by the parties and the record on this issue has not been fully developed.  The undersigned is not in a position to determine whether a Kentucky court's exercise of personal jurisdiction in this case

would be proper, particularly given that Plaintiffs have not alleged any statute of limitations or other bar to refiling this suit in Kentucky.  Thus, transfer to Kentucky is also not appropriate.

### C.     Plaintiffs' Entitlement to Jurisdictional Discovery

Plaintiffs filed their Complaint on September 7, 2006.  On October 5, 2006, upon the first appearance of counsel for the named Defendants, the undersigned entered an Order Requiring Scheduling Report [D.E. 6] pursuant to Local Rule 16.1.  That Rule requires that the parties submit a written report outlining their discovery plan, among other information.

In response, the parties filed an Agreed Motion for Enlargement of Time to File Joint Scheduling Report, Certificates of Interested Parties, and Corporate Disclosure Statements, in which they represented that they had "agreed that it would [be] inefficient to prepare and file a joint scheduling report . . . in advance of the Court's ruling on the motion to dismiss" Defendants were preparing.  (*Agreed Mot.* [D.E. 8] at 2).  The parties further sought leave to file the documents ordered 30 days after any ruling on the as-yet-unfiled motion to dismiss, for which the Court had set an extended briefing schedule per the parties' agreement [D.E. 5].

The parties' request for an enlargement of time was denied by Order dated October 26, 2006 [D.E. 10].  In that Order, the Court explained that "the pendency of a motion to dismiss, or the intention to file one, does not stay litigation or the need to establish pre-trial and trial dates to ensure the orderly progress of a case."  The parties were again instructed to file their joint scheduling report, and if they wished, to indicate their "preference to have a period of time for consideration of the motion to dismiss during which no merits discovery or other activity may occur." (*Id.*).  Thereafter, and upon receipt of the parties' proposed scheduling order [D.E. 16], the Court entered an Order

Case No. 06-22253-CIV-ALTONAGA/Turnoff

Setting Trial and Pre-Trial Schedule [D.E. 18].[9]

As stated, Defendants' Motion to Dismiss was filed on December 22, 2006.  Among the arguments presented was the argument that "the Court lacks personal jurisdiction over Defendants because they do not have sufficient contacts in Florida to satisfy the requirements of Florida's long-arm statute and the constitutional prerequisites of due process." (*Mot.* [D.E. 35] at 2).  This argument was addressed in eight pages of text in the Memorandum of Law in Support [D.E. 36], and in the several declarations filed.  The argument was again addressed in approximately 10 pages of text in Defendants' Reply Memorandum [D.E. 74].  Defendants' Motion to Dismiss was not fully briefed until the filing of Plaintiffs' Sur-Reply Memorandum [D.E. 89] on July 6, 2007, over six months after the Motion was filed.

Plaintiffs at no time sought leave of court to take limited jurisdictional discovery.  They did not do so when apprised of Defendants' intention to seek a dismissal prior to the Motion being filed, and they did not do so upon being formally challenged on the basis of lack of personal jurisdiction.  In a footnote of their Memorandum of Law in Opposition to the Motion to Dismiss, Plaintiffs state that if the Court finds they have not sufficiently demonstrated the existence of jurisdiction, "they should be permitted to take jurisdictional discovery.  A plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable jurisdictional discovery." (*Resp. Br.* at 47 n.10).  Again, in their Corrected Sur-Reply Memorandum, Plaintiffs state they have a qualified right to jurisdictional discovery, and if the Court is not inclined to exercise jurisdiction based on the facts in the record, Plaintiffs request the opportunity to engage in jurisdictional discovery and thereafter file

---

[9] The Order Setting Trial and Pre-Trial Schedule was abated by order dated May 30, 2007 [D.E. 84], as a result of "the delays in briefing the issue raised in Defendants' Motion to Dismiss Complaint."

a supplemental memorandum.  (*See Sur-Reply Br.* [D.E. 92-2] at 41).  Nevertheless, in the over six months it has taken the parties to fully brief the Motion, no motion seeking jurisdictional discovery was filed.

The question thus presented is whether the Court should postpone its decision concerning personal jurisdiction to allow Plaintiffs an opportunity, almost a year after the suit was filed and after all arguments have been presented in writing and orally, and in the absence of a formal motion or other showing as to the scope of any proposed jurisdictional discovery request and on the factual showing made by Plaintiffs, to engage in such discovery.  The answer is "No."

It is well-accepted that a qualified right to jurisdictional discovery exists.  *See, e.g., Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 729-31 (11th Cir. 1982).  Under Federal Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, . . . ."  Discovery is not limited to the merits of a case, as it is available to ascertain the facts bearing on issues such as jurisdiction or venue. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978).  Thus, "'[a] plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by withholding information on its contacts with the forum.'" *Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1, 15 (D.C. Cir. 2003) (quoting *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996)).

The standards for permitting jurisdictional discovery vary by circuit.  For example, the standard for permitting jurisdictional discovery is "quite liberal" in the D.C. Circuit.  *Id.*  In the D.C. Circuit, a plaintiff need not make out a *prima facie* case of jurisdiction before obtaining jurisdictional discovery.  *Id.*  (citing *In re Vitamins Antitrust Litig.*, 94 F. Supp. 2d 26, 35 (D.D.C. 2000); *GTE*

*New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1352 (D.C. Cir. 2000) (where court permitted jurisdictional discovery although it could not "tell whether jurisdictional discovery will help to sort out" the jurisdictional issues in the case)).  In contrast, the Second and Seventh Circuits require that a plaintiff first establish a *prima facie* case of jurisdiction over the defendant before the plaintiff is entitled to jurisdictional discovery.  *See Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185-86 (2d Cir. 1998) (district court did not err in denying jurisdictional discovery where plaintiffs did not establish a *prima facie* showing of jurisdiction over a foreign corporation); *Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946-47 (7th Cir. 2000) (district court did not abuse discretion in denying jurisdictional discovery where evidence was insufficient to show a colorable basis for jurisdiction).

Two reported decisions of the Eleventh Circuit address the issue of jurisdictional discovery, with varying outcomes based primarily on the records presented in each case.  In *Eaton*, the court found that the trial court's dismissal of a complaint for lack of subject matter jurisdiction under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701-1720, before jurisdictional discovery was taken, was premature.  *See* 692 F.2d at 730-31.  At the time of the dismissal, plaintiff had served subpoenas *duces tecum* on the defendant and another entity plaintiffs maintained the defendant had acted in concert with, *see id.* at 728-29, in an effort to show the two companies had engaged in a "common promotional plan" under section 1701(4), *see id.* at 731.  The trial court dismissed the suit for lack of subject matter jurisdiction less than one week before the discovery would have been received, and after plaintiffs had asked the court to reserve ruling on the question of jurisdiction until they could obtain the discovery to develop additional jurisdictional facts.  *See id.* at 729.

In reversing the trial court, the court in *Eaton* first acknowledged that jurisdictional discovery is "not entirely discretionary." *Id.* The Eleventh Circuit also reviewed decisions of the Fifth Circuit, which reinforced the conclusion that a qualified right to jurisdictional discovery exists. *See id.* at 730 (citing *Blanco v. Carigulf Lines*, 632 F.2d 656 (5th Cir. 1980) (reversal where answers to interrogatories were overdue at time of dismissal); *Chatham Condo. Ass'ns v. Century Village, Inc.*, 597 F.2d 1002, 1012 (5th Cir. 1979) ("'dismissal for lack of subject matter jurisdiction . . . prior to giving the plaintiff ample opportunity for discovery, should be granted sparingly'"); *Williamson v. Tucker*, 645 F.2d 404, 414 (5th Cir.), *cert. denied*, 454 U.S. 897 (1981) (prior to Rule 12(b)(1) dismissal where jurisdictional facts are in dispute, court must give the plaintiff opportunity to discover facts necessary to establish jurisdiction)). Thus, the *Eaton* court reversed with instructions that plaintiff be given an opportunity to develop facts to support a finding of jurisdiction. *See id.* at 731.

In *Posner*, the Eleventh Circuit considered the correctness of the trial court's order dismissing a case for lack of personal jurisdiction or international abstention. *See* 178 F.3d 1209. The defendant in *Posner* challenged plaintiffs' jurisdictional allegations with an affidavit from one of its officers, and plaintiffs did not produce any evidence to contradict it. *See id.* at 1214. In a footnote, the Eleventh Circuit disposed of the jurisdictional discovery issue as follows:

> Plaintiffs claim a right to jurisdictional discovery. Although Plaintiffs correctly cite precedent from this court, . . . in support of a qualified right to conduct jurisdictional discovery, those cases are distinguishable. In *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 729-31 (11th Cir. 1982) . . . the plaintiffs had served interrogatories . . . before the motion to dismiss was ruled on: discovery was already under way. Here, no discovery efforts were made in the eight months between the time Plaintiffs filed the complaint and the time it was dismissed . . . . Plaintiffs' only allusion to jurisdictional discovery was on the first page of their memorandum in opposition to the motion to dismiss filed seven and one-half months after the complaint and more than five months after the filing of the motion to dismiss; even then, Plaintiffs failed

to specify what they thought could or should be discovered. The district court, therefore, did not so much deny discovery as it dismissed the case before discovery was taken. We cannot say that the district court erred.

*Id.* at 1214 n.7.

The decision to allow jurisdictional discovery is very much a product of the timing and nature of any jurisdictional discovery request. For example, in *Bosdorf v. Beach*, 79 F. Supp. 2d 1337, 1342 (S.D. Fla. 1999), the court dismissed an action under the *Rooker-Feldman*[10] doctrine after noting that the state court had not denied discovery, but merely dismissed the case before discovery was taken, as plaintiffs had not propounded discovery before dismissal but had merely alluded to it in their opposition to the motion to dismiss. In the putative class action of *Matthews v. Brookstone Stores, Inc.*, 431 F. Supp. 2d 1219, 1227-28 (S.D. Ala. 2006), plaintiff's request, contained in a memorandum in opposition to a motion to dismiss, that ruling on the Rule 12(b) motion should be postponed until the parties had an adequate opportunity to take jurisdictional discovery, was granted. In *Instabook Corp. v. Instantpublisher.com*, 469 F. Supp. 2d 1120, 1127 (M.D. Fla. 2006), plaintiff's request for jurisdictional discovery was denied where the request was contained in its memorandum in opposition to a motion to dismiss, and in the event the court found the information insufficient to determine personal jurisdiction. There, "Plaintiff has only generally requested such discovery, without explaining how such discovery would bolster its contentions. . . ." *Id.*

Plaintiffs' actions in this case are similar to those of the plaintiffs in *Posner*, and in contrast to the timely efforts undertaken by the plaintiffs in *Eaton*. Plaintiffs in this suit have undertaken no effort to engage in limited jurisdictional discovery, notwithstanding their awareness that Defendants

---

[10] *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

intended to vigorously oppose the exercise of jurisdiction over them.  No explanation is offered as to why, since December of 2006, when Defendants first challenged personal jurisdiction, Plaintiffs did not seek to take discovery concerning Defendants' contacts with the State of Florida.  The "requests" for jurisdictional discovery contained in Plaintiffs' memoranda in opposition to Defendants' Motion to Dismiss are not a substitute for the issuance of discovery requests or the filing of a formal motion to take discovery.  If jurisdictional discovery is what Plaintiffs wanted, it is altogether unclear why they agreed with Defendants not to take any discovery until after the Court ruled on Defendants' Motion to Dismiss.

Much of the information gathered by Plaintiffs concerning Defendants' contacts with the United States comes from publicly-available documents, websites, and news accounts.  On the basis of that publicly-available information, Defendants, known public figures, have minimal if any personal contacts with this State, although corporations with which  they associate do have such contacts.  Accordingly, on the present record and at the present stage of the proceedings, the undersigned is not persuaded that the Motion to Dismiss should be deferred any longer while Plaintiffs engage in discovery in an attempt to make a *prima facie* or other showing that the Court's exercise of personal jurisdiction over Defendants would be appropriate.

## III.   CONCLUSION

Given the Court's finding that personal jurisdiction is lacking, the undersigned need not address the other issues extensively briefed by the parties.  Accordingly, it is

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss the Complaint **[D.E. 35]** is **GRANTED** as follows:

Case No. 06-22253-CIV-ALTONAGA/Turnoff

     (1)     Plaintiffs' Complaint [D.E. 1] is **DISMISSED WITHOUT PREJUDICE** for lack

of personal jurisdiction.

     (2)     The Clerk of the Court is instructed to **CLOSE** the case.

     (3)     All pending motions not otherwise ruled upon are **DENIED AS MOOT**.

     **DONE AND ORDERED** in Chambers at Miami, Florida this 30th day of July, 2007.

*Cecilia M. Altonaga*

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

Copies provided to:
(1) Magistrate Judge William C. Turnoff
(2) Counsel of record

26